## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **STRYKER CORPORATION**, a Michigan corporation; | ) ) ) Case No. |
| Plaintiff, | ) ) The Honorable _____ |
| v. | ) ) **JURY DEMAND REQUESTED** |
| **KAREL GLESS**, an individual; | ) ) |
| Defendant. | ) |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff STRYKER CORPORATION ("Stryker"), for its Complaint for Injunctive and Other Relief against Defendant Karel Gless ("Gless"), states as follows:

## INTRODUCTION

After six years of serving as one of Stryker Neurovascular's top marketing executives, Karel Gless suddenly resigned, and took employment with one of Stryker's competitors, Cerenovus. What Stryker discovered in the aftermath of Gless' resignation though demands immediate action. Indeed, through its forensic investigation, it uncovered that Gless received a job offer from Cerenovus in mid-May 2018, but hid that offer from Stryker until June 18, 2018, when he resigned. More disconcerting, throughout the year, Gless continuously accessed and sought highly confidential Stryker information, which he seemingly downloaded to external media devices (that he failed to return to Stryker), and otherwise exported in copious notes he took on Stryker's programs and then emailed to himself through Gmail.

Moreover, in further disregard of his contractual obligations to Stryker, Gless failed to return Stryker property, on which Stryker confidential information resides. By engaging in these activities, Gless clearly intends to misappropriate Stryker's trade secrets, goodwill, and customer

relationships for his benefit, and that of his new employer, and in unfair competition with Stryker.

Through this action, Stryker seeks to bring an immediate end to Gless' scheme, through temporary and ultimately permanent injunctive relief to protect Stryker's business, including its customer relationships, goodwill, confidential information and trade secrets.

## NATURE OF THE ACTION

1.      This is an action for breach of contract, actual and threatened misappropriation of trade secrets, and conversion. Stryker seeks temporary, preliminary and permanent injunctive relief, in addition to other damages.

2.      Stryker, through its neurovascular ("NV") division, is a global leader in the development, manufacture and sale of best-in-class neurovascular medical device technologies. NV products include devices for the minimally-invasive treatment of hemorrhagic (aneurysm) and ischemic (blockage) strokes as well as to facilitate the physician's access to the patient's neurovascular system.

3.      Until June 29, 2018, Gless was employed as the Senior Group Product Manager of the flow diverting stent ("FDS") Franchise (part of the hemorrhagic group) at NV. In this position, Gless was responsible for charting the global marketing strategy for NV's FDS products, including launching products in the United States, and developing FDS clinical strategy, competitive positioning, five-year plans, and new product regulatory, launch, and marketing strategies.

4.      Put simply, Gless understands Stryker's business strategies, including upcoming product launches, marketing strategies, and Stryker's future growth plans, development plans for prospective products, and pricing and marketing strategies to grow Stryker's business. In other

2

words, the exact type of information a direct competitor could use to unfairly compete with Stryker.

5.      While Gless disclosed that he intended to take a job with Cerenovus prior to leaving Stryker, Stryker was particularly concerned about the role that Gless intended to take with Cerenovus, and, on June 27, 2018, Stryker sent him a letter, reminding him of his ongoing obligations and requesting an explanation as to how he expected to perform his new role for Cerenovus without disclosing Stryker's confidential and trade secret information. On June 29th, Cerenovus' outside counsel responded, indicating that she would be responding on Gless' and Cerenovus' behalf, but, to date, no substantive response has been provided.

6.      Following Gless' departure, Stryker performed a forensic review of Gless' Stryker-issued computer and discovered a series of highly disconcerting items:

   a. Within the year before Gless terminated his Stryker employment, he inserted no less than 11 external media devices into his Stryker-issued computer, including inserting one into his computer on June 18, 2018, the day he resigned his Stryker employment. He did not return any of these external media devices.

   b. Starting in February 2018, Gless began requesting information about Stryker's acute ischemic stroke ("AIS") program, despite it not being within his duties and responsibilities for Stryker. In his new role with Cerenovus, Gless is heading up Cerenovus' AIS Marketing Group.

   c. In his role with the Strategic Growth Team at Stryker, Gless was part of a highly limited group of people who helped drive Stryker's short and long-term strategic decisions. These decisions and strategic plans were captured in something referred to as the "Golden Book", with Stryker NV strategies for the next five years identified in the book. The Golden Book was distributed to team members, including Gless, at certain times in electronic and hard copy form. After Gless' employment ended, Stryker looked in his office and none of the Golden Books distributed to him were within his office and he did not return any of them to Stryker.

   d. Between 2016 and 2018, Gless utilized DropBox and accessed a series of documents that appear to be highly confidential Stryker documents concerning various hemorrhagic programs.

3

e. Despite not resigning until June 18, 2018, Gmail fragments show that Cerenovus offered him a job and agreed to pay for him to move as early as May 21, 2018.

f. By June 1, 2018, Gmail fragments show that Gless was telling people that he had already informed Stryker customers that he was moving to Cerenovus.

7. These activities were unknown to Stryker when Gless terminated his employment, but have been discovered over the course of the last few weeks.

8. In light of the forensic review of Gless' computer as well as Gless' and Cerenovus' failure to respond to Stryker's June 27th letter, Stryker has no other option than to seek injunctive relief and court intervention to re-obtain its confidential and trade secret information.

9. Accordingly, Stryker seeks to temporarily, preliminarily and permanently enjoin Defendants from using or threatening to use Stryker's confidential and trade secret information, and from breaching his contract with Stryker.

10. Absent such injunctive relief, Stryker faces irreparable injury, including the loss of its trade secrets, its competitive advantage, its confidential information and goodwill in amounts which may be impossible to determine unless Gless is enjoined and restrained by order of this Court.

## **PARTIES**

11. Stryker Corporation is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Kalamazoo, Michigan. As of June 2018, Gless was employed by Stryker Corporation working on behalf of the NV division.

12. Gless is an individual domiciled in and a resident of, on information and belief, Irvine, California. Until recently, Gless resided in San Jose, California.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states (Stryker is a Michigan corporation with its principal place of business in Michigan, Gless is a California citizen) and the matter in controversy exceeds $75,000.00 excluding interest and costs. In addition, the Court has jurisdiction over Stryker's claim brought under the Defend Trade Secrets Act, pursuant to 28 U.S.C. § 1331, and this Court has supplemental jurisdiction over Stryker's remaining claims pursuant to 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over Gless, and venue is proper in this District under 28 U.S.C. § 1391(a) pursuant to the Stryker Confidentiality, Intellectual Property and Non-Solicitation Agreement, as well as the Stryker Corporation Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement (the "Agreement" or "Agreements"), through which Gless consented to personal jurisdiction and venue in this Court. Further, Gless committed and continues to commit tortious acts in and/or related to this State. Additionally, Stryker's principal place of business is in Kalamazoo, Michigan, and it regularly conducts business in Michigan.

## EVENTS GIVING RISE TO THIS ACTION

### STRYKER'S BUSINESS

15.     Stryker, through its Neurovascular ("NV") division, is a global leader in the development, and manufacture of best-in-class neurovascular medical device technologies. NV products include minimally-invasive devices for the treatment of hemorrhagic (aneurysm) and ischemic (blockage) strokes as well as other products which facilitate the physician's access to the patient's neurovascular system and deliver those devices. Stryker's products include the

Neuroform stent systems, Surpass flow diverter, and Target detachable coils for the treatment of hemorrhagic stroke, the AXS Universal aspiration set, FlowGate2 balloon guide catheter, and Trevo XP ProVue stent retriever for the treatment of ischemic stroke, and a variety of catheter and guidewire products as part of the access product line. These products are sold internationally and in interstate commerce.

16.     In basic terms, the NV products fall into three main categories: (1) access products; (2) hemorrhagic stroke products; and (3) ischemic stroke products. Access products include catheters and guidewires a physician uses to access the patient's brain through the femoral artery. The second and third product categories are inserted into the patient using the access products to treat a hemorrhagic stroke (aneurysm) by using stents and coils, or an ischemic stroke (a blockage) by using stents and other products. One of the types of stents which Stryker developed, and over which Gless served as senior group product manager, is its flow-diverting stent ("FDS"). All NV products are designed to be minimally invasive and a more patient-friendly alternative than open-skull surgery.

17.     Stryker's NV products are primarily used across three medical specialties: endovascular neurosurgery, interventional neurology, and interventional neuroradiology. NV products are primarily used in the operation room, cath lab or interventional suite.

18.     Stryker's products have a broad appeal and acceptance in the marketplace and among the medical community.

19.     The neurovascular device and products industry is highly competitive. One of Stryker's direct competitors is Cerenovus.

20.     During the course of Gless' NV career, he held a series of positions, achieved based on a series of promotions within NV. Most recently, Gless served as NV's Senior Global

6

Product Manager. In this position, Gless was responsible for planning, directing, and coordinating product direction and the efforts of NV for FDS products. In particular, Gless assisted NV in assembling commercial teams around the world, and Gless was intimately involved in NV's most recent efforts to launch an FDS product in North America.

21. In addition, Gless was also heavily involved in Stryker's Physician Engagement Program, through which he frequently had voice-of-client sessions ("VOCs") with some of the most prominent NV surgeons nationwide. For example, in 2017, alone, Gless completed VOCs with 14 different surgeons across the United States. Through these VOCs, Stryker expects its managers, including Gless, to continue to develop and foster Stryker's customer relationships with these surgeons.

22. Stryker invests substantial time and resources to build and maintain its trade secrets and confidential information, as well as its goodwill and long-term relationships with physicians and hospitals, such as through the VOCs. Its trade secrets and its customer relationships often take years to establish and are crucial to the success of Stryker's business.

### GLESS' EMPLOYMENT WITH STRYKER

23. Gless began working for Stryker in April 2012, first as a Global Product Manager, before being promoted to Senior Global Product Manager, and eventually to Senior Group Product Manager. All of these positions were within Stryker NV's marketing department.

24. Within NV's marketing group, product responsibility is divided amongst the marketing department by "franchises", with each "franchise" essentially a different class of NV-related products. In his last position, Gless was responsible for overseeing the global marketing for NV's FDS products, which are also sold by Stryker under the Surpass brand name. Surpass is a flow-diverting stent. Essentially, a flow-diverting stent is an alternative medical procedure to

7

address aneurysms, whereby instead of placing a device (such as a coil) inside the aneurysm, a device is placed in a blood vessel to divert blood away from the aneurysm itself. Stryker has had worldwide success with its Surpass product, and has been working toward a U.S. approval and launch for the past 18 months.

25.     In Gless' role, he was responsible for setting global marketing strategy for Surpass, launching the product in countries around the world, and developing marketing strategies for new products and concepts.

26.     As a Senior Group Product Manager within Global Marketing for Stryker's Neurovascular division, Gless had visibility to the business's most sensitive confidential and proprietary information related to the entire neurovascular business. He was intimately involved in long-term strategic and programmatic discussions as well as key decision making from early concept design through commercialization. His involvement included, but was not limited to, assessment and development of long-term strategy, product development and iterations, advanced market analytics, collection and analysis of competitive intelligence, development of competitive positioning, evaluation of global sales data, and aggregation of key customer information.

27.     Additionally, in his role, Gless headed up the FDS Strategic Growth Team ("SGT"). SGTs existed for each of the franchises within Stryker NV, and the SGT was tasked with advising the Innovation Growth Counsel about expected growth, designing next generation technology, and overall marketing and business strategies. The various SGTs also worked hand-in-hand, so that Gless, in his role heading up the FDS SGT would have access to other SGTs responsible for other product lines within Stryker's hemorrhagic and acute ischemic stroke franchises.

8

28.     These teams met multiple times per year and the work they performed was memorialized in a short- and long-term strategy plan called the "Golden Book." In 2018 alone, Gless participated in multiple SGT meetings with the Innovation Growth Counsel, including between April 16, 2018 and April 20, 2018, and on or around May 1, 2018 or May 2, 2018. Indeed, as a byproduct of their work, the Golden Book was released around June 20, 2018.

29.     As a member of the Hemorrhagic Strategic Growth Team and the Innovation Growth Council, Gless participated in and had full visibility and detailed awareness of highly sensitive discussions not only for Stryker's entire line of hemorrhagic products, but also for Stryker's acute ischemic stroke (AIS) and intracranial atherosclerotic disease (ICAD) franchises as well. In the performance of his duties, Gless had significant knowledge of and considerable access to the highest level of product, market and strategic Stryker confidential information and trade secrets relating to its NV business. This confidential and trade secret information would enhance the use and marketability of numerous products lines of a direct competitor, including Cerenovus.

30.     Because of this, through his position, Gless was provided a virtual roadmap of Stryker NV's long-term and short-term strategy goals. He is aware of Stryker NVs' upcoming product launches, NV's acquisition targets, NV's marketing and pricing strategies around the world for its product launches, NV's strategies for responding to competitors, including Cerenovus, and other information that is highly restricted within Stryker NV.

31.     Given Gless' new position with Cerenovus, is in a very similar capacity as a Senior Director, Marketing, Global Acute Ischemic Stroke (hereinafter "AIS Director"). In this role, Gless will be leading Cerenovus' efforts to develop and implement the marketing strategy for Cerenovus' AIS franchise and products. Gless is and will be responsible for developing and

reviewing related strategy, clinical research, product development and business objectives for Cerenovus. The Cerenovus business directly competes with Stryker's Neurovascular business.

32.     If Gless uses or discloses such information on behalf of Cerenovus, he would be able to leverage a wide variety of Stryker confidential information that would be of great value to a competitor.

33.     If a competitor, like Cerenovus, learned this information they would be able to adjust their own development plans to offer competing products based off of Stryker's proprietary market research and analysis.

34.     Because of his work with Stryker NV's VOCs, Gless also was directly involved in growing Stryker's customer relationships. Accordingly, Gless knows the products and programs that most appeal to Stryker NV's customers, as well as their feelings about potential new product development plans.

35.     Gless also knows the top talent within the organization and the terms of compensation for Stryker's employees. Thus, Gless knows who are the best candidates to recruit from Stryker and the compensation terms necessary to induce those employees to leave Stryker and join a competitor.

## GLESS' AGREEMENTS WITH STRYKER

36.     In connection with his employment with Stryker, Gless executed the Stryker Confidentiality, Intellectual Property, and Non-Solicitation Agreement on April 25, 2012. A true and correct copy of Gless' 2012 Agreement is attached hereto as Exhibit 1.

37.     Based on his position with Stryker, Stryker offered Gless Restricted Stock Units ("RSUs") in 2018. As a condition of receiving those RSUs, on March 26, 2018, Gless executed the Stryker Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation

10

Agreement. As a result of executing the 2018 Agreement, Stryker provided Gless with RSUs. A

true and correct copy of Gless' 2018 Agreement is attached hereto as Exhibit 2.

38.     Pursuant to his Agreements, Gless acknowledged that the following was Stryker

Confidential Information:

> know-how, trade secrets, and technical, business and financial information and
> any other non-public information in any way learned by me during my
> employment with Stryker, including, but not limited to (a) prices, renewal dates
> and other detailed terms of customer or supplier contracts and proposals; (b)
> information concerning Stryker's customers, clients, referral sources and vendors,
> and potential customers, clients, referral sources and vendors, including, but not
> limited to, names of these entities or their employees or representatives,
> preferences, needs or requirements, purchasing or sales histories, or other
> customer or client-specific information; (c) supplier and distributor lists; (d)
> pricing policies, methods of delivering services and products, and marketing and
> sales plans or strategies; (e) products, product know-how, product technology and
> product development strategies and plans; (f) employees, personnel or payroll
> records or information; (g) forecasts, budgets and other non-public financial
> information; (h) expansion plans, management policies and other business
> strategies; (i) inventions, research, development, manufacturing, purchasing,
> finance processes, technologies, machines, computer software, computer
> hardware, automated systems, engineering, marketing, merchandising, and
> selling. Confidential Information shall not include information that is or becomes
> part of the public domain, such that it is readily available to the public, through no
> fault of me.

(Agreements, § 2.2).[1]

39.     Gless also agreed not to disclose or misuse Stryker's Confidential Information:

> I recognize that Confidential Information is of great value to Stryker, that Stryker
> has legitimate business interests in protecting its Confidential Information, and
> that the disclosure to anyone not authorized to receive such information, including
> any entity that competes with Stryker, will cause immediate irreparable injury to
> Stryker. Unless I first secure Stryker's written consent, I will not disclose, use,
> disseminate, identify by topic or subject, lecture upon or publish Confidential
> Information. I understand and agree that my obligations not to disclose, use,
> disseminate, identify by subject or topic, lecture upon or publish Confidential

---

[1] The 2018 Agreement includes a subsection (j), which reads: "information belonging to third
parties which has been disclosed to Stryker in confidence." (2018 Agreement, §2.2.)

Information shall continue after the termination of my employment for any reason.

(Agreements, § 5.1.)

40.     Further, Gless agreed that upon termination of his Stryker employment, he would return all Stryker property, including all Stryker Confidential Information, to Stryker. (Agreements, §§ 5.2, 5.3.)

41.     By executing the Agreements, Gless recognized that a breach of any his obligations owed to Stryker would cause Stryker irreparable harm. (Agreements, § 8.1.)

42.     The Agreements also provide that any litigation arising out of the Agreements shall be conducted exclusively in the State of Michigan and Gless consented to the jurisdiction of the federal and/or state courts in Michigan. (Agreements, § 8.2.)

43.     Further, Gless agreed that Stryker "will be entitled to recover from me its reasonable attorneys' fees and costs of any action that it successfully brings for my breach or threatened breach of this Agreement." (Agreements, §8.1.)

## STRYKER'S CONFIDENTIAL AND PROPRIETARY INFORMATION

44.     As discussed above, to perform his jobs at Stryker, Gless was provided access to Stryker's confidential information, including Stryker's:

  a.  Overall growth and product development strategies;

  b.  Marketing plans and promotional strategies;

  c.  Pricing strategies, including terms and conditions of sales, profit margins, product pricing discounts, etc.;

  d.  Competitive strategies, including new product launches and products under development;

  e.  Customer retention strategies, including strategies for withstanding competitive pressure from Cerenovus and others;

  f.  Product regulatory approval status information; and

    g.  Top performing sales representatives and compensation terms and the identifies of prospective hires.

45.    Additionally, Gless had access to certain of Stryker NV's restricted SharePoint site, which contained extremely detailed confidential information. This included highly confidential global AIS, ICAD, and hemorrhagic marketing materials, and other strategy documents.

46.    Further, due to his position, Gless received daily, weekly, and monthly sales reports, detailing sales by product and by product category. These results were provided on a country-by-country basis, worldwide.

47.    All of this information was highly confidential within Stryker NV, was provided on a need-to-know basis only, and Gless was expected to keep this information highly confidential and only use it on Stryker NV's behalf.

48.    Stryker requires that its information be kept strictly confidential by its employees and restricts access to this information. Stryker takes specific measures to preserve the confidentiality of this information, including, but not limited to, the following:

    a.  Requiring employees to sign confidentiality agreements containing covenants designed to maintain confidentiality and to return Stryker's property upon termination;

    b.  Requiring its employees to maintain the confidentiality of Stryker's information and protect Stryker's assets;

    c.  Prohibiting the use of Stryker's computer systems for non-company purposes;

    d.  Restricting their access to computerized information through the use of passwords;

    e.  Prohibiting the unauthorized physical removal of company information (via paper, disc, flash drive or other media) and electronic transmission of such information (via email or other means); and

> f.  Restricting access to computerized company information based on each individual employee's "need to know" the particular information.

49.  Stryker rigorously maintains the confidentiality of its information because the information provides Stryker a competitive advantage in the marketplace from which Stryker derives economic value.

50.  Stryker's trade secrets and confidential and proprietary information are of great value to Stryker and would give any competitor of Stryker—including Gless and potentially Cerenovus—an unfair competitive advantage by: not expending the time and resources to develop the trade secret and confidential and proprietary information as Stryker did; quickly developing products and technologies to unfairly compete with Stryker in order to diminish Stryker's head start; alerting a competitor as to initiatives that should not be pursued; identifying Stryker's top employees to hire away from Stryker; and other improper advantages.

## GLESS TERMINATES HIS EMPLOYMENT WITH STRYKER AND STRYKER DISCOVERS GLESS' MISAPPROPRIATION

51.  On June 18, 2018, Gless announced his resignation from Stryker, and informed Stryker that he was joining one of Stryker's direct competitors, Cerenovus, heading up its marketing for its acute ischemic stroke product lines. In conversations with Gless when he announced his resignation, multiple Stryker employees questioned how Gless could occupy this role without divulging and using Stryker's trade secret information.

52.  Stryker was all the more concerned by the timing of Gless' departure for several reasons. First, Cerenovus announced in late May 2018 that it was launching EmboTrap, a product that directly competes with Stryker's Trevo product line. Second, based on Gless' participation with the SGT, he was intimately familiar with Stryker NV's plans as it relates to all of Stryker NV's product lines, including its hemorrhagic, AIS, and ICAD product lines.

14

53.     On June 20, 2018, Stryker conducted an exit interview with Gless. During that interview, Gless returned his Stryker-issued laptop, cell phone, and IPad, but he did not return any other physical documents or external media devices.

54.     On June 27, 2018, Stryker sent Gless a letter, seeking an explanation as to how Gless could maintain his job with Cerenovus without disclosing Stryker's trade secret information, as well as demanding that Gless return Stryker's property to it.

55.     On June 29, 2018, counsel for Cerenovus responded to Stryker's letter, promising a response, but, as of the filing of this complaint, none has been provided.

56.     Given his competitive position, Stryker engaged an outside expert to forensically image Gless' devices.

57.     In imaging and analyzing Gless' Stryker-issued computer, Stryker uncovered extremely disturbing information, relating to Gless' downloading history, use of various Cloud-based storage repositories, use of various external media devices, failure to return such external media devices, and information pertaining to his taking a job with Cerenovus.

58.     Moreover, in communicating with other Stryker NV employees following Gless' departure, Stryker NV also uncovered a series of highly questionable activities by Gless, such as his requesting information about product lines for which he had no responsibility as well as requesting information about competitors in the marketplace who sold products that his marketing group did not promote. These emails and requests went all the way back into February 2018.

59.     What these forensic efforts and Stryker's investigation uncovered were deliberate and longstanding efforts by Gless to hide his interviewing with Cerenovus and his significant downloading of Stryker's most sensitive information, including highly confidential Stryker

15

planning and marketing documents.

60.     Specifically, through the forensic imaging, Stryker was able to uncover a series of Gmail Webmail fragments. Further, Stryker also uncovered various DropBox activity on Gless' Stryker-issued computer.[2] Lastly, while external media devices were plugged into Gless' Stryker-issued computer, certain documents were opened, with none of these devices being returned, suggesting that these particular documents, if not hundreds or thousands more, are saved there.

61.     From this, Stryker was able to piece together the following timeline of events:

   a.   In or around February 2018, Gless began interviewing for a new job.[3]

   b.   Almost immediately upon starting to interview, Gless began requesting information for product segments outside of his day-to-day responsibility, including requesting information on a competitive AIS company, Penumbra in February 2018, and even requesting information pertaining to all physician site visits on the day he resigned.

   c.   On or around March 8, 2018, March 14, 2018, and March 30, 2018, Gless interviewed with Cerenovus, based on "thank you" emails he drafted within his Stryker email account.

   d.   On or around April 5, 2018, he interviewed with Cerenovus. The email mentions a follow-up meeting to take place during the next week.

   e.   By May 2, 2018, it appears that Cerenovus had offered Gless the position that he ultimately took.

   f.   Around May 4, 2018, Gless began receiving information pertaining to Cerenovus's "Arise II Deck." "Arise II" was the name of the EmboTrap clinical

---

[2] Stryker is concerned with the materials that appear to be in Gless' DropBox account. Gless was not authorized to upload this material to DropBox or to retain this information.

[3] Stryker was able to discern this because Gless had a habit of preparing emails in draft form in his Stryker email account which he apparently later sent from his Gmail account. Stryker's email server saves copies of draft emails, which Stryker recovered after Gless' employment terminated. Stryker was able to confirm that Gless was sending these emails from his Gmail email account because identical language was discovered in the Gmail fragments Stryker recovered.

trial that Cerenovus ran prior to obtaining approval to sell the product in Europe.

    g.    On May 9, 2018, Gless signed his offer letter with Cerenovus.

    h.    By May 21, 2018, Cerenovus provided Gless information about its relocation package.

    i.    Moreover, by May 21, 2018, Gless confirmed by an email in which a moving company confirmed his upcoming move from San Jose to Irvine, California, where Cerenovus is headquartered.

    j.    On June 2, 2018, Gless wrote an email that partially reads: "A few key … customers know. Transitioning work to team to prepare for transition. Invested significant time learning T resig board …" This email highly suggests that by June 2, 2018, Gless was already informing Stryker customers that he was moving to Cerenovus, weeks before he notified Stryker.

    k.    On June 3, 2018, Gless set up a OneDrive account, which is a cloud-based storage repository, similar to DropBox.

    l.    On June 5, 2018, Gless composed an email requesting an earlier start date at Cerenovus.

62.    Making this behavior all the more concerning, between March 2018 and June 2018, Gless, along with others on the SGTs worked on the 2018 Golden Book. This material was highly confidential, restricted to a very limited number of NV executives, and, during the course of preparing this material, Stryker developed its next-generation technology, strategies, and marketing surrounding its future growth plans. Included within the Golden Book was Stryker's top secret plans for its hemorrhagic, AIS, and ICAD product lines, including products with which Gless will now compete directly on Cerenovus' behalf.

63.    Simultaneous with this, at least 11 different external media devices were plugged into Gless' Stryker-issued computer during the last year of his employment, with none returned.

64.    In particular, within the last year of his employment, the following devices were inserted into Gless' Stryker-issued computer:

| INSERTION DATE | DEVICE NAME | SERIAL NUMBER |
| --- | --- | --- |

17

| | 6/18/18 6/18/18 | USB DISK USB Device | sn3109134488&0 |
|---|---|---|---|
| | 4/9/18 | USB Device [USB20FD] | au31112690000003&0 |
| | 3/27/18 3/26/18 | SMI USB DISK USB Device | aa00000000004128&0 |
| | 3/1/18 | USB Device [USB20FD] | au31112690000003&0 |
| | 9/28/17 8/30/17 | Generic Flash Disk USB Device [Mass Storage] [D:\] | 138cd11b&0 |
| | 9/28/17 8/30/17 | Generic Flash Disk USB Device [Mass Storage] | 138cd11b&0 |
| | 7/2/17 | Kindle Internal Storage USB Device | 6&14bc7458&0 |
| | 7/2/17 | USB Mass Storage Device [Internal Storage] | 5&30561c7&0&4 |
| | 6/24/17 | Kindle Internal Storage USB Device | 6&3a2fd5a2&0 |
| | 6/23/17 | USB Mass Storage Device [Internal Storage] | 5&30561c7&0&2 |
| | 6/19/17 | General UDisk USB Device | 7&2cc124b&0&_&0 |
| | 6/2/17 | FLASH Drive SM_USB20 USB Device [TrusCont Publisher USB] [E:\] | 0000000000081371&1 |

65.     The timing of the June 18th insertion is particularly suspect. First, he plugged the device into his Stryker computer at 6:28 a.m. (the same day he resigned his employment). At 6:41 a.m., while the external media device was plugged into Gless's Stryker-issued computer, the folder Documents\Stryker was opened. Based on the metadata associated with this file, there appear to be a series of Stryker confidential and trade secret documents pertaining to Stryker's AIS programs, for which he now has responsibility on Cerenovus's behalf.

66.     None of these devices were returned by Gless to Stryker and Stryker has not uncovered any of these devices since Gless terminated his Stryker employment.

67.     While Stryker has not had time to determine what files Gless accessed at the time that the devices were plugged into the computer, Stryker has determined that Gless accessed at least several PowerPoint presentations from such external media devices, the contents of which

18

appear to be Stryker information.

68.     Practically speaking, what this means, is that, when an external media device is plugged into a computer, if a document is opened on that external media device, a footprint is left within the computer's metadata. Here, Stryker knows some of the files that were maintained on external media devices plugged into Gless' computer based on the files opened on the external media device while that device was plugged into the Stryker-issued computer.

69.     Each of these files were accessed on external media devices between March 1, 2018—when Gless was interviewing—and June 18, 2018, the day that Gless provided Stryker with notice.

70.     Stryker was not provided any of these external media devices upon Gless' departure.

71.     Given the long interview process with Cerenovus, the fact that a month passed between the time Cerenovus offered Gless a job and when Gless provided his resignation, and the highly confidential trade secret information to which Gless was exposed during this time, Stryker is highly concerned about Gless' ability to maintain the confidentiality of Stryker's information.

### EFFECT OF GLESS' EMPLOYMENT WITH CERENOVUS

72.     With the departure of Gless and his possession and his knowledge of Stryker's confidential information and trade secrets, Stryker stands to lose millions of dollars in intellectual property, and the loss of value of its trade secrets and confidential and proprietary information, which cannot be adequately addressed at law.

73.     By definition of his position with Cerenovus and his possession of Stryker's trade secrets, Gless will undoubtedly use or threaten to use Stryker's proprietary information.

19

47629532v.1

74.     Gless cannot perform his job for Cerenovus without violating his Agreement and without using Stryker's trade secrets and confidential information.

75.     All told, Gless is causing, threatening, and/or will continue to cause or threaten significant irreparable harm to Stryker, including the loss of value of confidential and/or proprietary information.

76.     Stryker needs injunctive relief to preserve its trade secrets and to regain possession of its highly confidential documents.

## COUNT I
## BREACH OF CONTRACT

77.     Stryker hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 76.

78.     The 2018 Agreement that Gless entered into with Stryker constitutes a valid and enforceable contract.

79.     Stryker performed all of the duties and obligations it agreed to and owed Gless under the 2018 Agreement.

80.     The post-employment activity restrictions contained in the Agreement is reasonable in both scope and duration, and are necessary to protect Stryker's legitimate protectable interests in its confidential business information.

81.     Gless breached and continues to breach his post-employment contractual obligations owed to Stryker by continuing to possess and, on information and belief, misusing Stryker's confidential and proprietary information.

82.     As a result of Gless' breaches of contract, Stryker has been irreparably injured, and it continues to face irreparable injury. It is threatened with losing the value of its confidential and proprietary information, for which a remedy at law is inadequate.

83.     Accordingly, Gless must be enjoined and restrained by Order of this Court to cease using and possessing Stryker's confidential and trade secret information.

84.     Stryker also seeks its actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and interest, all pursuant to the Agreement.

## COUNT II
## ACTUAL AND/OR THREATENED MISAPPROPRIATION OF TRADE SECRETS
### (MICHIGAN UNIFORM TRADE SECRET ACT, MICH. COMP. LAWS § 445.1901)

85.     Stryker hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 76.

86.     Stryker's confidential and proprietary information includes, *inter alia*, Stryker's overall, marketing, product development, customer retention, and sales strategies, and documents relating to such Stryker strategies.

87.     This information constitutes trade secrets, pursuant to the Michigan Uniform Trade Secret Act, MICH COMP. LAWS § 445.1901, *et seq.*, because Stryker derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

88.     Gless actually misappropriated and/or threatens to misappropriate Stryker's trade secrets without its consent, in violation of Michigan law.

89.     Gless will be or is being unjustly enriched by the misappropriation of Stryker's trade secrets, and, unless restrained, will continue to threaten to use, actually use, divulge, acquire and/or otherwise misappropriate its trade secrets.

90.     Gless' actual and/or threatened misappropriation has been willful and malicious,

21

particularly given: (a) Gless' repeated efforts to download Stryker trade secret information after beginning to interview with and accepting employment with Cerenovus; and (b) Gless continuing his employment with Stryker for over a month after he accepted a position with Cerenovus.

91.     As a result of the threatened and/or actual misappropriation of Stryker's trade secrets, Stryker has been injured and faces irreparable injury. Stryker is threatened with losing its trade secrets in amounts which may be impossible to determine, unless Gless is enjoined and restrained by order of this Court.

**COUNT III**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §1832, *et seq.***

92.     Stryker hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 76.

93.     The Defend Trade Secrets Act ("DTSA") defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public. *See* 18 U.S.C. §§ 1836, 1839.

94.     Gless acquired Stryker's trade secrets by improper means and without authorization. In particular, Gless obtained trade secrets from Stryker through, *inter alia*, having accessed and retained Stryker's confidential information and trade secrets even after his resignation. As discussed in great length above, Stryker's forensic review identified multiple external devices and Cloud-based accounts onto which Stryker's trade secret information was stored and, which Gless has not returned, despite repeated requests to do so.

22

95. Upon information and belief, Gless has also disclosed Stryker's trade secrets to Cerenovus in violation of his obligations under the Agreement and/or has or threatens to misappropriate Stryker's trade secrets in violation of the DTSA.

96. The information that Gless has, upon information and belief, provided to Cerenovus or threatens to provide to them regarding Stryker's strategic plans and research and development plans constitutes a trade secret within the meaning of the DTSA. Such information derives independent economic value from not being generally known to, or readily ascertainable by proper means by, the public; other persons can obtain economic value from its disclosure or use; and it is the subject of significant efforts to maintain its secrecy.

97. As detailed above, Stryker takes reasonable and appropriate measures to protect the confidentiality of the above-described trade secrets.

98. Gless knew or should have known that Stryker's trade secrets (a) are confidential; (b) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (c) were developed or acquired by Stryker at great expense and effort; (d) are maintained as confidential and are not generally available to the public or Stryker's competitors; (e) would provide significant benefit to a competitor seeking to compete with Stryker; and (f) are critical to Stryker's ability to conduct their businesses successfully.

99. As detailed above, Gless transferred and/or wrongfully obtained and accessed Stryker's trade secrets and failed to return Stryker's information, despite repeated requests from Stryker for Gless to do so.

100. As detailed above, Gless actively continued gathering Stryker's trade secrets even while he was in the process of obtaining employment with Cerenovus and meeting with Cerenovus. In fact, even after receiving an offer of employment from Cerenovus in May 2018,

Gless nevertheless continued to download Stryker's trade secrets to external media devices. The only purpose for Gless to obtain and retain Stryker's trade secrets is to use them to compete against Stryker on behalf of Cerenovus.

101.    By disclosing and/or threatening to disclose Stryker's trade secrets to Cerenovus without Stryker's consent, Gless has misappropriated or threatens to misappropriate Stryker's trade secrets in violation of the DTSA, which allows injunctive relief for actual or threatened misappropriation of trade secrets.

102.    The information that Gless has misappropriated or threatens to misappropriate describes and relates to Stryker's highly confidential research and development plans, which involve products that are sold in, utilized throughout, and/or travel through interstate commerce.

103.    Should Gless continue to disclose or threaten to disclose Stryker's trade secrets, the disclosure of such information will harm Stryker  and its legitimate business interests.

104.    If information pertaining to Stryker's trade secrets are disclosed to Cerenovus or other competitors of Stryker, it could destroy Stryker's competitive advantage.

105.    Because Gless' misconduct is ongoing and it poses a threat of significant irreparable harm that cannot be compensated by money alone, Stryker request that this Court grant injunctive relief against Gless from actual or threatened disclosure or utilization of Stryker's trade secrets, in addition to granting Stryker its attorneys' fees and exemplary damages.

**COUNT IV**
**CONVERSION**

106.    Stryker hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 76.

107.    Gless removed from Stryker or retained its property, including but not limited to, confidential and proprietary information, without authorization, and converted it to his own use.

24

108.   Stryker demanded from Gless that he return its confidential information, through the terms of the 2012 and 2018 Agreement.

109.   Stryker is entitled to the return of its property from Gless, according to the Agreements.

110.   Gless failed to return to Stryker its property.

111.   As a direct and proximate result of Gless' actions, Stryker has been damaged.

112.   Stryker has suffered damages as a result of Gless' actions in an amount to be determined at trial, and because its remedy at law is inadequate, seeks temporary, preliminary and permanent injunctive relief to recover and protect its property.

113.   Because Gless' actions were willful, malicious, outrageous, oppressive or done in complete disregard of the consequences they might have for Stryker, Stryker should be awarded exemplary and punitive damages in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Stryker seeks judgment in its favor and an Order against Gless that grants the following relief:

A.   Enjoins  Gless and all parties in active concert or participation with him or receiving notice of any injunction, from using or disclosing any of Stryker's confidential, proprietary and/or trade secret information;

B.   Order Gless and all parties in active concert or participation with him or receiving notice of any injunction, to return to Stryker all originals and copies of all files, devices and/or documents that contain or relate to Stryker's confidential and proprietary information, including without limitation, all computers, electronic media, PDA's and electronic storage devices;

C.   Ordering Gless and all parties in active concert or participation with him, to preserve all documents, data, and electronic information and to produce for inspection and imaging all computers, other electronic storage devices, Cloud-based storage repositories, and email accounts belonging to, under the control of, accessible to, or operated by Gless;

D.      Awards Stryker actual, incidental, compensatory, and consequential damages to be proven at trial;

E.      Awards Stryker exemplary or punitive damages in an amount to be proven at trial due to Gless' outrageous, willful and/or malicious activities;

F.      Awards Stryker its fees, costs and expenses incurred herein, including reasonable attorneys' fees and interest, pursuant to MICH. COMP. LAWS § 445.1901, *et seq.*;

G.      Awards Stryker its damages, costs, and expenses incurred herein, including reasonable attorneys' fees and interest, pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1832, *et seq.*; and

H.      Orders Stryker such further relief as the Court deems necessary and just.


**DATED: JULY 12 , 2018**                         Respectfully submitted,

                                                  **STRYKER CORPORATION**


                                                  By: /s/ Michael D. Wexler
                                                         One of Its Attorneys

David J. Gass
D. Andrew Portinga
MILLER JOHNSON
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, Michigan 49503
Telephone: (616) 831-1700
Facsimile:  (616) 831-1701

Michael D. Wexler
Justin K. Beyer
Robyn E. Marsh
Seyfarth Shaw LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois  60606
Telephone:  (312) 460-5000
Facsimile:  (312) 460-7000

*Attorneys for Plaintiff Stryker Corporation*